2010 UT 42

**In the matter of the ADOPTION OF T.B., a person under eighteen years of age.**

**T.M., Appellant,**

v.

**B.B. and S.B., Appellees.**

**No. 20090074.**

Supreme Court of Utah.

May 14, 2010.

Michael J. Boyle, Daniel S. Drage, Ogden, for appellant.

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellees.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 This appeal from the district court's denial of a putative father's motion to set aside the adoption of T.B., his biological daughter, was certified to this court by the court of appeals. We must determine whether the district court possessed jurisdiction to rule on the putative father's motion and assess the as-applied constitutionality of the provisions of Utah's adoption code that establish the circumstances under which an unwed natural father has the right to consent to an adoption.

¶ 2 We determine that the putative father's challenge to T.B.'s adoption was properly before the district court and that the district court correctly concluded that the application of Utah's adoption code to the putative father did not violate his constitutional rights. Accordingly, we affirm the district court's dismissal of the putative father's motion to set aside the adoption decree.

## BACKGROUND

¶ 3 As a result of a sexual relationship between A.B., T.B.'s natural mother, and T.J.M., T.B.'s putative father,[1] the natural mother became pregnant with T.B. in 2006. The natural mother and the putative father never married, and their relationship ended prior to T.B.'s birth.

¶ 4 The putative father was aware of the pregnancy and made attempts to obtain receipts from the natural mother and her parents so that he could assist with prenatal medical expenses. He also requested that the natural mother sign a release allowing him access to T.B.'s medical information so that he could monitor T.B.'s progress during

---

1. Because all the parties to this case are juveniles, we refer to them throughout this opinion either by initials or by their relationship to T.B., the adopted child.

the pregnancy. The natural mother and her parents refused these requests.

¶ 5 On the day T.B. was born, the natural mother, despite having promised the putative father that she would coordinate with him to allow him to be present at T.B.'s birth, registered in a different hospital than originally planned as a "silent patient." The putative father was nevertheless able to locate the room and visited T.B. and the natural mother on the day T.B. was born. T.B.'s maternal grandparents, who were present in the hospital room during the putative father's visit, disapproved of his association with T.B., and T.B.'s maternal grandfather offered the putative father a "$120,000 walking ticket" if he would depart from T.B.'s life. The putative father characterizes this as an offer to pay him off; the grandfather claims he was merely calling his attention to the expenses he could avoid by not raising T.B.

¶ 6 Whatever the nature of the maternal grandfather's offer, the putative father declined the invitation, and insisted on remaining involved in T.B.'s life. He came to an informal agreement with the natural mother and her parents under which he would help pay monthly child support expenses and be allowed some visitation rights.

¶ 7 The putative father had contact with T.B. during the first five months of her life. He spent parent-time with T.B. for three to five hours, two times a week, usually at his parents' home. He also had family pictures taken with T.B. and held a baby shower for her. Occasionally, the putative father or his parents would take T.B. to daycare. For a time, the maternal and paternal grandparents coordinated daycare schedules. The putative father also purchased child care supplies so that when he was with T.B. he, or his parents, would be able to care for her needs.

¶ 8 Shortly after T.B.'s birth, and unbeknownst to the putative father, the natural mother and her parents initiated adoption proceedings. The natural mother's parents, who were T.B.'s maternal grandparents, filed a petition to adopt T.B. on February 23, 2007—sixteen days after T.B. was born. The case was assigned to Judge Roger S. Dutson of the Second District. On April 2, 2007, the natural mother consented to the adoption and relinquished her parental rights before the district court.

¶ 9 On June 20, 2007, the natural mother's parents informed the putative father that they were in the process of adopting T.B. and that the adoption would extinguish his parental rights. Approximately one month later, on July 18, 2007, the putative father filed a Verified Petition for Order of Paternity, Custody and Child Support in the district court, naming the natural mother as a defendant. The paternity action was assigned to Judge Ernest W. Jones. After July 29, 2007, just over a week following the putative father's filing of his paternity action, the natural mother and her parents refused to allow the putative father to have any further contact with T.B. The adoption decree was entered on August 16, 2007.

¶ 10 On August 20, 2007, the natural mother filed a motion to dismiss the putative father's paternity action, arguing that the district court lacked subject matter jurisdiction over T.B. since both of the natural parents' rights had been terminated by T.B.'s adoption. Judge Jones dismissed the putative father's paternity action with prejudice on September 4, 2007. The putative father filed a motion to set aside the dismissal on September 20, 2007, which Judge Jones granted on December 12, 2007. Judge Jones subsequently transferred the paternity action to Judge Dutson, who ordered it consolidated with the adoption proceedings.

¶ 11 Shortly after the putative father's paternity action was transferred to Judge Dutson, the putative father filed a motion to have the adoption decree set aside. The motion was filed under the same case number as the original adoption proceeding, even though the putative father was not named as a party in that proceeding and had not filed a motion to intervene. The putative father argued that (1) the adoption was void because the adoptive parents had not strictly complied with the adoption code, (2) the application of the adoption code to terminate his parental rights unconstitutionally violated his rights to due process and equal protection, and (3) the termination of his parental rights was con-

trary to public policy given his commitment to fatherhood.

¶ 12 The natural mother responded to the merits of the putative father's claims, arguing that his motion failed to satisfy the requirements of rule 60(b) for obtaining relief from a final judgment. She also argued that, in any event, the adoption decree was proper because the adoption code was constitutional and the putative father had failed to adequately comply with the statutory requirements for obtaining a right to consent to the adoption of T.B. The natural mother's opposition memorandum did not contain any objection to the court's jurisdiction, aside from a brief statement in a footnote noting that the putative father's motion "seem[ed] premature" because he was not a party to the adoption action and had not attempted to intervene.

¶ 13 The natural mother subsequently filed a notice to submit for decision and the district court denied the putative father's motion to set aside the adoption on July 3, 2008. The court held that "present law" required it "to sustain the adoption" because it was undisputed that the putative father had failed to comply with the requirements of the adoption code. The court also stated, in dicta, that it appeared that the putative father's motion to set aside was insufficient because "[t]here appear[ed] to be no grounds within Rule 60 that would support [the putative father's] attack" and because "[the putative father] ha[d] failed to act timely in his effort to have the judgment set aside." Finally, the district court opined that while this case raised questions regarding whether the Utah appellate courts' strict construction of the adoption code was consistent with the constitutional rights of natural fathers, these issues were best reviewed by appellate courts.

¶ 14 The putative father timely appealed the district court's ruling, and the court of appeals certified the case to this court. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(b) (2008).

**STANDARD OF REVIEW**

¶ 15 The putative father's challenge to the adoption decree presents questions of consti-tutional law and statutory interpretation, which we review for correctness.[2]

**ANALYSIS**

¶ 16 On appeal, the putative father argues that the adoption code is unconstitutional as applied to him in that it violates his rights to due process and equal protection under the federal constitution. The natural mother responds by arguing that the district court lacked jurisdiction to rule on the putative father's motion to set aside the adoption decree because he never intervened in the adoption proceedings. She also contends that, even if the district court did properly reach the merits of the putative father's motion, its decision to deny the motion should be affirmed because (1) there is no dispute that the putative father failed to obtain the right to consent through compliance with the requirements of the adoption code and (2) our prior case law establishes that the adoption code is constitutional as applied in this case.

¶ 17 We first analyze whether the district court was correct in reaching the merits of the putative father's motion, and, because we conclude that it was, we then address the district court's ruling on the merits.

I. THE DISTRICT COURT PROPERLY REACHED THE MERITS OF THE PUTATIVE FATHER'S MOTION BECAUSE THE MOTION QUALIFIED AS A COLLATERAL ATTACK ON THE ADOPTION DECREE PERMITTED UNDER UTAH CODE SECTION 78B–6–133(7)

¶ 18 On appeal, the natural mother argues that the district court lacked jurisdiction to address the merits of the putative father's motion because he failed to intervene in the adoption proceeding. Although she acknowledges that the district court consolidated the putative father's paternity action with the adoption proceeding, the natural mother asserts that while "consolidation is permitted as a matter of convenience and economy in administration, [it] does not

---

**2.** *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 19, 203 P.3d    943.

merge the suits into a single case ... or make those who are parties in one suit parties in another." Because the putative father never sought to intervene in the adoption proceeding, the natural mother contends that he is not a party to the adoption and that both this court and the district court are jurisdictionally barred from reaching the merits of his motion.[3] We need not address the natural mother's arguments regarding intervention, however, because we conclude that, even if the putative father did not intervene, his motion qualified as a collateral challenge to the adoption decree as permitted by Utah Code section 78B–6–133.

¶ 19 Although section 78B–6–133 does not set forth a particular vehicle for mounting a collateral attack to an adoption decree, it clearly contemplates that such an attack may be made. Section 78B–6–133(7) imposes limitations on the right to contest adoptions, "regardless of whether the adoption is contested directly or collaterally."[4] Specifically, the statute prohibits three groups of persons—parties to the adoption proceeding, persons served with notice of the adoption proceeding, and persons who have executed a consent to the adoption or a relinquishment of parental rights—from contesting adoptions at all (other than by appeal in the adoption proceeding itself)[5] and imposes a one-year limit on the time during which any challenge to a decree of adoption may be made.[6]

¶ 20 By expressly negating the right of these three specific categories of persons to challenge an adoption by a means other than direct appeal, it is clear that the statute contemplates that a person not within these categories may bring a challenge to an adoption decree—so long as the challenge is brought within one year of the entry of the decree of adoption. This conclusion is further supported by subsection 78B–6–

133(7)(d), which makes clear that an appeal may be taken from both a district court's entry of a "final decree of adoption" and a court's decision "in an *action challenging an adoption*."[7]

¶ 21 And although the statute does not name the specific procedural vehicle for mounting a collateral challenge, subsection 78B–6–133(7)(d) suggests that a separate action challenging the adoption, on whatever ground, is a proper means of challenging an adoption decree. Therefore, so long as the putative father (1) does not fall within the categories expressly excluded from challenging an adoption decree and (2) mounted a collateral challenge to T.B.'s adoption within a year of the entry of the decree, the district court had jurisdiction under section 78B–6–133(7) to entertain the merits of the putative father's challenge.

¶ 22 Here, the natural mother does not dispute that the putative father is not a party to the adoption proceeding. Indeed, she strenuously argues that he is not. Although his case was consolidated with the adoption, the natural mother correctly notes that the consolidation did not merge the two actions or make him a party to the adoption proceeding.[8] The record also does not indicate that the putative father was served with notice of the adoption proceeding or that he had either consented to T.B.'s adoption or executed a relinquishment of his parental rights. Therefore, we conclude that the putative father falls within the class of individuals who the statute contemplates may mount a collateral attack on an adoption decree.

¶ 23 We further determine that the putative father's paternity action, as well as his motion to set aside, qualify as timely collateral challenges to the adoption. Both the paternity action and the motion to set aside were filed within one year of the entry of T.B.'s adoption decree. Additionally, the

---

3. *See Ostler v. Buhler,* 1999 UT 99, ¶ 7, 989 P.2d 1073.

4. Utah Code Ann. § 78B–6–133(7)(c)(i) (2008).

5. *Id.* § 78B–6–133(7)(a).

6. *Id.* § 78B–6–133(7)(b).

7. *Id.* § 78B–6–133(7)(d) (emphasis added).

8. *See In re San Rafael River Drainage Area,* 844 P.2d 287, 291–92 (Utah 1992) (" 'Except where provided by statute, a consolidation in equity does not merge the suits and they maintain their separate identity in so far as the parties, issues, and proof are concerned.' " (quoting 1A C.J.S. *Actions* § 217, 690 (1985))).

substance of both make clear that they are direct challenges to T.B.'s adoption. The challenge is made explicit in the putative father's motion to set aside the adoption, where he seeks to have the adoption decree rendered void and his parental rights reinstated. And in his paternity action, the putative father, while not expressly calling for the adoption to be set aside,[9] sought relief from the district court—including an order changing T.B.'s last name and an order of custody and parent-time—that was clearly incompatible with the termination of his parental rights. Because the putative father brought these collateral challenges to the adoption within the allowed one-year time period, we hold that the putative father's challenge was properly before the district court. We must now resolve the questions certified to us by the court of appeals.

## II. THE DENIAL OF THE PUTATIVE FATHER'S RIGHT TO CONSENT PURSUANT TO SECTION 78B–6–121 IS CONSTITUTIONAL

¶ 24 Although he acknowledges the facial constitutionality of the adoption code, the putative father asserts that its application to him is unconstitutional, both under the Due Process and Equal Protection clauses of the United States Constitution. Specifically, the putative father argues that the statutory provisions denying him the right to consent to T.B.'s adoption are unconstitutional as applied to him because he had acquired, by virtue of the substantial relationship he developed with T.B. prior to the entry of the adoption decree, a fundamental parental liberty interest—including the right to consent to T.B.'s adoption—protected by the Due Process clause.

¶ 25 He also contends that the adoption code is an unconstitutional violation of his right to equal protection because it unjustifi-

ably differentiates between unwed natural fathers based solely on the age of their child. Utah's adoption code provides that, for children six months and older, the extent of an unwed natural father's relationship with his child should be considered in determining whether he has the right to consent to that child's adoption.[10] The statute requires no similar consideration for fathers of children under six months of age.[11] The putative father argues that it is irrational for the legislature to draw this distinction. We address each of his arguments in turn.

*A. Denial of the Putative Father's Right to Consent in T.B.'s Adoption Is Not an Unconstitutional Deprivation of Liberty Without Due Process of Law Because the Putative Father Has Not Acquired a Fundamental Parental Right in the Care, Custody, and Control of T.B.*

▪ ¶ 26 Utah's adoption code provides that an unwed natural father may acquire the right to consent to an adoption by satisfying certain statutory requirements. Absent this, the statute states that "consent of an unmarried biological father is not required."[12] According to statute, the father must (1) initiate paternity proceedings; (2) file notice that he has commenced paternity proceedings with the state registrar of vital statistics; (3) file a sworn affidavit with the district court stating that he is willing and able to take full custody of the child, setting forth his plans to care for the child, and agreeing to a court order of child support and payment of medical expenses; and (4) offer to assist, and actually assist, with expenses associated with the pregnancy and birth.[13] Each of these requirements must be satisfied prior to the time that the natural mother executes her consent to adoption or relinquishes the child for adoption.[14] It is undisputed that the

---

9. Indeed, the putative father filed the paternity action prior to the entry of the adoption decree, so, at the time the action was filed, he could not have expressly sought to have the decree set aside.

10. Utah Code Ann. § 78B–6–121(1) (2008).

11. *Id.* § 78B–6–121(3).

12. *Id.*

13. *Id.* § 78B–6–121(3)(a)–(d).

14. *Id.* § 78B–6–121(3). In this case, these acts occurred on April 2, 2007. Thus, the putative father could have taken the statutory steps necessary to preserve his parental rights at any time prior to this date. This time period includes not only the weeks following T.B.'s birth, but also the nine months during which the natural mother was pregnant.

putative father did not comply with a number of these requirements, if for no reason other than his failure to initiate paternity proceedings until July 18, 2007—more than three months after the natural mother executed her consent to T.B.'s adoption.

¶ 27 But the putative father does not argue that he has acquired the right to consent to T.B.'s adoption by statute; rather, he contends that he acquired a constitutional parental right of consent by virtue of voluntarily assuming parental obligations and developing a substantial relationship with his daughter. He asserts that, based on his interactions with T.B. in between her birth and when she was adopted, he obtained fundamental parental rights—including the right to consent to her adoption—which cannot be taken away by statute absent a compelling state interest.

¶ 28 Although he acknowledges that the adoption code generally serves the compelling interest of realizing speedy and final adoptive placements, the putative father contends that the code does not serve that compelling interest in his case because T.B.'s adoption was an in-home placement. Since an in-home placement does not change the day-to-day living circumstances of the adopted child—because the child continues to live in the same home and continues to be cared for by the same people as before—he argues that there is no compelling need for the premature termination of an unwed natural father's parental rights based solely on procedural noncompliance. The putative father characterizes T.B.'s in-home placement as a "sham adoption," made solely for the purpose of "excising" him from his daughter's life. Regardless of whether the state interest served by the statutory denial of a right to consent in the context of a traditional adoption would be sufficient to override his parental rights, the putative father argues

that a "sham adoption" does not justify such an infringement.

¶ 29 We first address the putative father's argument that he has acquired fundamental parental rights based on the relationship he developed with T.B. prior to her adoption. Because we conclude that the putative father did not acquire a constitutional right to consent prior to the natural mother's relinquishment of T.B. for adoption, we need not address the putative father's contention that in-home adoptive placements do not serve the compelling interests that could justify infringing on such a fundamental parental right.

■■■ ¶ 30 While the United States Supreme Court has recognized that the Fourteenth Amendment provides parents a protectable liberty interest in "the care, custody, and control of their children," and that such an interest is a fundamental right,[15] the Court has not extended this same fundamental right to unwed natural fathers based solely on the existence of a biological connection. Instead, the Court has stated that "the rights of the parents are a counterpart of the responsibilities they have assumed."[16] As a result, constitutionally protectable "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."[17]

¶ 31 In *Lehr v. Robertson*, the Court determined that what the Due Process clause protects, at least as far as an unwed natural father is concerned, is the *"opportunity"* to develop a relationship, by taking a responsible role in the life of his child.[18] So long as a state's adoption code contains procedures that provide a putative father a meaningful chance to preserve his opportunity to develop a relationship with his child, due process is satisfied.[19] If an unwed father develops that

---

15. *Troxel v. Granville*, 530 U.S. 57, 65–66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.").

16. *Lehr v. Robertson*, 463 U.S. 248, 257, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983).

17. *Id.* at 260, 103 S.Ct. 2985 (emphasis and internal quotation marks omitted).

18. *Id.* at 262, 103 S.Ct. 2985.

19. *Thurnwald v. A.E.*, 2007 UT 38, ¶ 25–26, 163 P.3d 623 ("Under both federal and state law, an unwed biological father has an inchoate interest in a parental relationship with his child that acquires full constitutional protection only when

relationship, his parental rights go from being purely statutory to having "substantial" constitutional protection.[20]

¶ 32 In this case, the putative father contends that he has obtained a constitutionally protected right to consent to T.B.'s adoption by virtue of his having "fully assumed the responsibilities of parenthood," and having "established a loving bond and substantial relationship" with his daughter. We disagree. We first note that, in support of his claim that he has assumed parental responsibilities and established a substantial relationship, the putative father references actions he took from the day of T.B.'s birth, on February 7, 2007, through July 29, 2007, when the natural mother and T.B.'s maternal grandparents cut off his access to his daughter. But the relevant period of time, at least so far as assessing the merits of his constitutional challenge is concerned, is from the day T.B. was born until the day the natural mother consented to T.B.'s adoption. After the natural mother had given her consent, the putative father's opportunity to acquire the

right to consent was eliminated by statute.[21] If he had failed to acquire a right of consent by that day, the putative father has no valid constitutional objection to the operation of the statute.

¶ 33 In this case, the natural mother consented to T.B.'s adoption on April 2, 2007— fifty-four days after T.B.'s birth. We find nothing in the Supreme Court's past decisions or our own prior case law suggesting that less than two months of interaction between an unwed natural father and his child is sufficient to confer full-blown constitutionally protected parental rights on a putative father.[22] While we recognize the significance that even this short period of interaction may hold for a putative father, as the Supreme Court stated in *Lehr*, the constitution does not confer fundamental parental rights absent a relationship and commitment that is *"more enduring."* [23]

¶ 34 We acknowledge that the Supreme Court has not examined how long a relationship must endure before it will be deemed the kind of "substantial relationship" that

he demonstrates a full commitment to the responsibilities of parenthood by [coming] forward to participate in the rearing of his child.... In *Lehr,* the United States Supreme Court recognized that individual states may define when an unwed father has grasped that opportunity." (alteration in original) (citations and internal quotation marks omitted)).

20. *Lehr,* 463 U.S. at 261, 103 S.Ct. 2985.

21. Utah Code Ann. § 78B–6–121(3).

22. The prior cases in which this court has found due process violations have been situations in which the putative father had no reasonable opportunity to comply with the statutory procedures through which he could protect his provisional parental rights. *See, e.g., In re Adoption of Baby Boy Doe,* 717 P.2d 686 (Utah 1986) (finding an unwed natural father's due process rights violated by application of the adoption code where the mother hid the fact that she would deliver her baby in Utah, the baby was born prematurely, and the father did not know the child had been born in Utah until after relinquishment for adoption); *Thurnwald v. A.E.,* 2007 UT 38, 163 P.3d 623 (stating that if Utah Rule of Civil Procedure 6 had not extended time for unwed fathers to file a paternity suit, the due process rights of an unwed father would have been violated where the father was unable to meet the statutory deadline because his child was

born over the weekend when the courts were closed). We have not specifically addressed the exact nature and length of the relationship required to obtain constitutional parental rights under *Lehr.* But the cases in which the United States Supreme Court has found that an unwed father acquired constitutionally protected parental rights have involved fathers whose involvement with their children had been both active and sustained over a number of *years* prior to the statutory termination of their parental rights. *See, e.g., Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (finding that a father who had lived with his children all their lives had a due process right to present evidence regarding his fitness as a parent prior to the termination of his parental rights); *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (finding that an unwed father who lived with his children for several years, was listed as their father on their birth certificates, and had continued to keep in close contact with the children was entitled to consent to their adoption). This case is readily distinguishable from both this court's and the Supreme Court's prior case law, in that the putative father had ample time to comply with the statutory requirements for obtaining a right to consent and had only sporadic, short-term involvement with T.B. prior to the natural mother's consent to the adoption.

23. *Lehr,* 463 U.S. at 260, 103 S.Ct. 2985 (internal quotation marks omitted).

gives rise to the liberty interest asserted by the putative father in this case. Some of the language in *Lehr* suggests that a substantial relationship can be developed as long as the father merely " '[comes] forward to participate in the rearing of his child,' "[24] or takes "some measure of responsibility for the child's future."[25] The dissent relies on this language to conclude that a putative father need merely start down a path toward parental responsibility in order to attain the right to veto an adoptive placement of his child.[26]

¶ 35 For a number of reasons, however, these statements from *Lehr* cannot be read to give rise to parental rights every time an unwed father develops some relationship with his child. First, the father in *Lehr* had "never supported and rarely seen" his daughter in the two-year time period between his daughter's birth and when he filed a petition for the child's adoption.[27] Given these facts, it is unsurprising that the Court would call attention to the father's failure to meet even the lowest of requirements. But saying that the father in *Lehr* could not invoke constitutional protection because he failed to take "some measure of responsibility" is not the same as saying that such protection attaches to every father who takes any measure of responsibility. Indeed, in *Lehr*, the Court described the "difference between the developed parent-child relationship ... and the potential relationship" as "both clear and significant."[28] The former requires the father to "demonstrate[ ] a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child" and to "act[ ] as a father toward his children."[29] In the words of the Court, "[t]he importance of the familial relationship ... stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in promoting a way of life."[30] Read in this context, the Court's statements about taking "some measure of responsibility" and "coming forward to participate in the rearing of [a] child"[31] should not be construed as identifying the event that will trigger constitutional protection. They are better understood as an articulation of the failures of the father in that case.

¶ 36 This conclusion is reinforced by the fact that the first time the Supreme Court addressed the requirement that a father "come forward to participate in the rearing of his child" was in *Caban v. Mohammed*.[32] In that case, the father had lived with and supported his two children for several years.[33] Those facts prompted the Court to find that he had developed a substantial relationship with his children—a relationship the Court contrasted with cases where a father "never has come forward to participate in the rearing of his child."[34] This statement was meant to identify those situations where constitutional protection will certainly not apply, not to suggest that constitutional protection always applies in every other case.

¶ 37 The proposition that constitutionally protected substantial relationships must be developed over a period of time is supported by comparison of relevant Supreme Court cases. In *Stanley v. Illinois* and *Caban v. Mohammed*, two cases where the parental rights of unwed fathers were found to warrant constitutional protection, the fathers had assumed responsibility for their children for years.[35] In contrast, in *Lehr* the father's

---

**24.** *Id.* at 261, 103 S.Ct. 2985 (quoting *Caban*, 441 U.S. at 392, 99 S.Ct. 1760).

**25.** *Id.* at 262, 103 S.Ct. 2985.

**26.** *See infra* ¶¶ 53, 56.

**27.** *Lehr*, 463 U.S. at 249–50, 103 S.Ct. 2985.

**28.** *Id.* at 261, 103 S.Ct. 2985.

**29.** *Id.* (internal quotation marks omitted).

**30.** *Id.* (internal quotation marks omitted).

**31.** *See id.*

**32.** 441 U.S. 380, 392, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).

**33.** *Id.* at 382, 99 S.Ct. 1760.

**34.** *Id.* at 392, 99 S.Ct. 1760.

**35.** The father in *Stanley v. Illinois* lived with the mother of his children for eighteen years. During this time, they had three children, all of whom he had raised and lived with for their entire lives. 405 U.S. 645, 646, 650 n. 4, 92 S.Ct. 1208. In *Caban*, the father had lived with his two children until they were, respectively, two and four years old. 441 U.S. at 381–82, 99 S.Ct. 1760.

interests were found not to garner constitutional protection where he had taken no responsibility for his daughter in the two years following her birth.[36]

¶ 38 Also instructive is *Quilloin v. Walcott*.[37] In that case, a father sought the right to refuse to consent to the adoption of his daughter by the child's stepfather.[38] The father had "provided support only on an irregular basis," but had "given toys and gifts" to his child "from time to time," and had "on many occasions" visited with the child.[39] This relationship, such as it was, persisted for eleven years after the child's birth before the stepfather initiated adoption proceedings.[40] The father argued that state statutes that treated him differently from a married father violated federal equal protection standards.[41] In rejecting his argument, the Court characterized his relationship with his daughter as follows: "[H]e has never exercised *actual or legal custody* over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." [42]

¶ 39 These hallmarks of parental responsibility differ from the factors that the dissent proposes should be used to measure the substance of the relationship between T.B. and the putative father in this case. The dissent proposes that the putative father's relationship garners full-blown constitutional protection because: he was aware of the pregnancy and made an effort to assist with prenatal expenses; he sought to monitor the progress of the pregnancy and was present on the day of T.B.'s birth; he entered an agreement to pay child support; he visited T.B. regularly before T.B. was relinquished for adoption; he purchased child-care supplies for T.B.; and he had pictures taken with T.B.[43] While

we do not intend to discount the value of these actions, they strike us as falling short of "shoulder[ing] any significant responsibility with respect to the daily supervision, education, protection, or care of the child." [44] Admittedly, the relevant Supreme Court cases do not definitively address how much responsibility a father must bear to acquire the right to veto an adoptive placement. But they do provide valuable guidance regarding whether a relationship is so "enduring" and "substantial" that the state must, in spite of its statutory scheme, grant the father the right to withhold his consent to an adoptive placement of the child.

¶ 40 Although an unwed natural father may be fully willing to take the actions that would establish such a relationship—and may even attempt to do so—the constitution itself does not require that adoption be postponed (or re-evaluated) in order to guarantee him enough time to develop a substantial relationship with his child. Instead, the constitution requires that the state provide meaningful procedures through which the father may protect his opportunity to do so. As we have recognized in the past, due process guarantees an unwed natural father the right to preserve his parental opportunity by following state procedures.[45] If he fails to comply with the procedures available to protect his right to develop an enduring, committed relationship with his child, a putative father risks the possibility that the natural mother's relinquishment of the child may eliminate his opportunity to acquire constitutionally protectable parental rights before he has been able to obtain them.

¶ 41 Although the dissent questions what more the putative father in this case could have done to safeguard his rights,[46] the an-

**36.** *Lehr,* 463 U.S. at 249–50, 103 S.Ct. 2985.

**37.** 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978).

**38.** *Id.* at 247, 98 S.Ct. 549.

**39.** *Id.* at 250–51, 98 S.Ct. 549 (internal quotation marks omitted).

**40.** *Id.* at 249, 252–53, 98 S.Ct. 549.

**41.** *Id.* at 253, 98 S.Ct. 549.

**42.** *Id.* at 256, 98 S.Ct. 549 (emphasis added).

**43.** *Infra* ¶ 57.

**44.** *Quilloin,* 434 U.S. at 256, 98 S.Ct. 549.

**45.** *Thurnwald v. A.E.,* 2007 UT 38, ¶ 25–26, 163 P.3d 623.

**46.** *Infra* ¶ 57.

swer to that question is not elusive—he could have complied with the statutory scheme established by the Utah Legislature for acquiring the right to withhold consent to an adoption, even in the absence of a constitutionally protected substantial relationship. In Utah, a father can protect his opportunity to develop a relationship with his child by complying with the relevant statutory provisions—whether the child's mother cooperates or not—at any time after the father learns the mother is pregnant.[47] In this case, T.B.'s putative father had more than fifty days after T.B.'s birth, in addition to the time during which T.B.'s natural mother was pregnant, to take the necessary statutory steps to protect his interest.

¶ 42 Here, we have not been presented with a statutory scheme that permits a child's mother to control whether a putative father's parental rights will be extinguished. Rather, Utah's statutory scheme permits a father to protect himself by invoking statutory procedures before the child is relinquished for adoption. The putative father in this case has simply failed to do so. He does not dispute that he was aware of the natural mother's pregnancy. Indeed, he communicated with the natural mother prior to T.B.'s birth and was able to locate her in the hospital the day T.B. was born. At any time prior to T.B.'s birth, the putative father could have complied with Utah's statutory requirements for obtaining a right to consent to T.B.'s adoption. Furthermore, he had an additional fifty-four days from T.B.'s birth to the natural mother's consent to the adoption during which he could have obtained a right to consent by fulfilling the requirements of section 78B–6–121. This is not the "exceptional" case, as was *In re Adoption of Baby Boy Doe*, where a combination of factors denied the putative father a reasonable opportunity to preserve his chance to develop a relationship with his child.[48]

¶ 43 Nor is it a case where state law has overlooked the liberty interests of a father who has developed a relationship with his children over the course of years. In *Stanley v. Illinois*[49] and *Caban v. Mohammed*[50] the state statutes examined by the Supreme Court were constitutionally infirm because they failed to account for years of parental responsibility and financial support undertaken by biological fathers.[51] While we do not mean to discount the relationship between the putative father and T.B., it is not the kind of relationship deemed "substantial" in those cases. As such, the United States Constitution does not require that these adoption proceedings be overturned in spite of the opportunity to preserve his rights that was afforded to, but not seized by, the putative father.

¶ 44 Accordingly, we determine that the putative father failed to secure the statutory right to consent to the adoption because he did not comply with the statutory requirements. Furthermore, we hold that the putative father's constitutional rights were not violated where he had an adequate opportunity to comply with these statutory requirements. Because the putative father failed to do so, and because the relationship he developed over two months is insufficient to give rise to constitutional protection independent of state law, the denial of the putative fa-

**47.** Utah Code section 78B–6–121(3)(d)(i) (2008) provides that a father's failure to comply with the statutory requirements will not cut off his rights to notice and consent if "he did not have actual knowledge of the pregnancy." Because it is undisputed that T.B.'s putative father knew of the pregnancy, we have no need to examine the operation of this statutory provision.

**48.** 717 P.2d 686, 691 (Utah 1986) (holding that "[u]nder the circumstances of [that] case," representations of the mother, combined with actions of her family, a premature birth of which the putative father was unaware, and the putative father's absence from the state at the time of birth rendered the termination of the putative father's parental rights "contrary to basic notions of due process").

**49.** 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

**50.** 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979).

**51.** *See Stanley*, 405 U.S. at 646, 92 S.Ct. 1208 (father lived with his three children and their mother intermittently for eighteen years); *Caban*, 441 U.S. at 389, 392–93, 99 S.Ct. 1760 (father "participate[d] in the rearing of his child" and "established a substantial relationship" over the course of several years).

ther's right to consent pursuant to section 78B–6–121(3) did not operate to deny him liberty without due process of law.

*B. The Denial of the Putative Father's Right to Consent Without Consideration of His Relationship to T.B. Does Not Violate His Right to Equal Protection Because There Is a Rational Basis for the Statutory Distinction Between Fathers of Children Based on the Age of Their Adopted Child*

■ ¶ 45 The putative father also argues that the application of Utah's adoption code violates his right to equal protection because it does not provide for consideration of his relationship with T.B. simply because T.B. happened to be under six months old at the time the natural mother executed her consent to the adoption.

■■ ¶ 46 The Equal Protection clause of the federal constitution requires that similarly situated individuals be treated similarly.[52] Whenever a legislative classification treats two groups differently, the constitution requires that the classification must be rationally related to a legitimate government interest.[53] Additionally, the law is required to pass heightened scrutiny when it either classifies based on a suspect criterion—such as race—or burdens a fundamental right.[54] In these cases, the constitution demands that the classification be a narrowly tailored means of advancing a compelling government interest.[55] Thus, in order to prevail on his equal protection claim, the putative father must either show that (1) the distinction between fathers based on the age of their child is not rationally related to a legitimate state interest or (2) the distinction burdens one of his fundamental rights and fails to pass strict scrutiny.

¶ 47 As we have noted in our prior cases, the state has a strong interest in placing children with adoptive parents who will take responsibility for their care and custody.[56] And in order not to diminish the pool of potential adoptive parents, the state has a related interest in making these proceedings speedy and final and in mitigating the contentiousness and uncertainty that might undermine an adoptive placement.[57] In order to advance this interest, the legislature has determined that it will not permit an unwed father to contest an adoption if his child is under six months of age and if the father has otherwise failed to meet the relevant statutory obligations. Later in the child's life, the state's interests may change—because the father-child relationship becomes substantial, because older children are harder to place

between mothers and fathers, we have thoroughly examined this state interest:

> "It is and should be the policy of the law to so operate as to encourage the finding of suitable homes and parents for children in that need. It is obvious that persons who might be willing to accept a child for adoption will be more reluctant to do so if a consenting parent is permitted to arbitrarily ... [change] her mind and revoke the consent, and thus desolate the plan of the adoptive parents and bring to naught all of their time, effort, expense and emotional involvement.... A moment's reflection will reveal that to the degree that such commitments are given respect and solidarity, so they can be relied upon, persons desiring children will be willing to accept and give them homes. Conversely, to the degree that such commitments can easily be withdrawn and the adoptive plan thus destroyed, such persons will tend to be discouraged from doing so."

*Wells*, 681 P.2d at 203 (alteration in original) (quoting *In re Adoption of F*, 26 Utah 2d 255, 488 P.2d 130, 134 (1971)). This reasoning is equally applicable here.

---

52. *ABCO Enters. v. Utah State Tax Comm'n*, 2009 UT 36, ¶ 14, 211 P.3d 382.

53. *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988).

54. *Gallivan v. Walker*, 2002 UT 89, ¶ 40, 54 P.3d 1069 ("Where a legislative enactment implicates a fundamental or critical right or creates classifications which are considered impermissible or suspect in the abstract, we apply a heightened degree of scrutiny." (internal quotation marks omitted)).

55. *See id.* ¶¶ 82–83.

56. *See Swayne v. L.D.S. Soc. Servs.*, 795 P.2d 637, 643 (Utah 1990) (" '[T]he state has a strong interest in speedily identifying those persons who will assume the parental role over [illegitimate] children ....' " (quoting *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 203 (Utah 1984) (second alteration in original))).

57. In the context of an equal protection challenge based on the statutory distinctions made

with adoptive parents, or because an older child is more likely to suffer emotional trauma by being placed with a new family. In light of these considerations, we cannot conclude that this statutory distinction is an irrational way of advancing the state's interests at differing stages of a child's life.

¶ 48 Furthermore, in light of our determination that the putative father failed to obtain any fundamental parental rights in T.B. prior to the natural mother's consent to the adoption, the adoption code's classification of fathers does not burden one of the putative father's fundamental rights. Because the classification does not implicate a fundamental right, as applied to the putative father, there is no need to subject it to heightened scrutiny in this case.

¶ 49 Accordingly, we find that the provisions of the adoption code denying the right of consent to the putative father without consideration of the extent of his relationship with T.B. are not unconstitutional in violation of his right to equal protection.

### CONCLUSION

¶ 50 We affirm the district court's denial of the putative father's motion to set aside the adoption decree because, although we determine that the motion was properly before the district court as a collateral challenge, we find that the statutory provision denying the putative father the right to consent to T.B.'s adoption did not violate his rights to due process and equal protection.

¶ 51 Justice WILKINS and Justice PARRISH concur in Associate Chief Justice DURRANT'S opinion.

NEHRING, Justice, dissenting:

¶ 52 I respectfully dissent. Unlike the majority, I conclude that the putative father's conduct and his interactions with T.B. were sufficient to establish a constitutionally protected substantial relationship under the Due Process Clause of the United States Constitution.

¶ 53 The majority correctly identifies the standard established by the United States Supreme Court for an unwed biological father to gain constitutional protection for his relationship with his child. The majority states that "[i]n *Lehr v. Robertson,* the Court determined that what the Due Process Clause protects, at least as far as an unwed natural father is concerned, is the *opportunity* to assume a responsible role in the future of his child." *Supra* ¶ 31. While the majority also correctly states that in a vast number of cases, state laws adequately protect this opportunity, "[i]n some cases . . . the Federal Constitution supersedes state law" to provide greater protection for certain parent-child relationships. *Lehr v. Robertson,* 463 U.S. 248, 257, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). This parental right "[does] not spring full-blown from the biological connection between parent and child," but "require[s] relationships more enduring." *Id.* at 260, 103 S.Ct. 2985 (emphasis and internal quotation marks omitted). Indeed, it is only "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child," that his relationship "with his child acquires substantial protection under the Due Process Clause." *Id.* at 261, 103 S.Ct. 2985 (internal quotation marks omitted).

¶ 54 Although the majority correctly concludes that federal constitutional protection may arise to protect a father's substantial relationship with his child, according to the majority, this constitutional right is only triggered if the father's relationship with his child is for "years." *Supra* ¶ 33 n. 22. Indeed, the majority states that "less than two months of interaction between an unwed natural father and his child is [in]sufficient to confer full-blown constitutionally protected parental rights on a putative father."[1] *Supra* ¶ 33.

¶ 55 Contrary to the majority's statement, there is nothing in the relevant Supreme

---

**1.** To bolster its assertion that years are required to develop a substantial relationship, the majority relies heavily on *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) and *Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), two cases where the United States Supreme Court recognized a substantial relationship between an unwed father and his child after years of interaction. The majority also relies on *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) and *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54

Court jurisprudence that so much as suggests that the Court has endorsed any minimum time period for the creation of a more "enduring" relationship worthy of constitutional recognition, much less that it must be a relationship over a period of years. In fact, the majority itself recognizes that "the Supreme Court has not examined how long a relationship must endure before it will be deemed the kind of 'substantial relationship' that gives rise to [a] liberty interest" worthy of constitutional protection, *supra* ¶ 34, nor

has the Supreme Court definitively addressed "how much responsibility a father must bear to acquire the right to veto an adoptive placement." [2] *Supra* ¶ 39. Thus, while the Supreme Court cases offer guidance on how to define a substantial relationship, whether a substantial relationship between father and child exists depends on the particular facts of each case.

¶ 56 I recognize that the child's age in this case presents a perplexing problem: the

L.Ed.2d 511 (1978) to argue that the relationship between T.B.'s father and his child more closely mirrors the facts in cases where the Court has declined to recognize a substantial relationship warranting federal constitutional protection.

While T.B.'s father did not assume responsibility for his daughter for a period spanning "years," it is also inaccurate to characterize T.B.'s father as taking "no responsibility" at all, like the father in *Lehr*, 463 U.S. at 262, 103 S.Ct. 2985, or as being only sporadically and irregularly involved from "time to time" like the father in *Quilloin*, 434 U.S. at 251, 98 S.Ct. 549. Rather, T.B.'s father falls somewhere on the spectrum between these cases. While the majority finds nothing that confirms that two months of weekly parental responsibility is enough to create an enduring relationship worthy of constitutional protection, I find nothing in the relevant United States Supreme Court precedent that prevents recognition of a substantial relationship under these circumstances.

2. The majority also relies substantially on *Quilloin*, 434 U.S. 246, 98 S.Ct. 549, to assert that a father must take more action than T.B.'s father did in this case in order to trigger a federal constitutional liberty interest requiring substantial protection. *See supra* ¶ 38. *Quilloin* involved the constitutionality of a state statute that authorized adoption of a child born out of wedlock without the consent of the natural father. 434 U.S. at 247, 98 S.Ct. 549. In the eleven years preceding the adoption, the father never sought to legitimize his child, nor did he, at any point, seek custody over him. *Id.* at 249, 98 S.Ct. 549. The father had notice of the adoption proceedings and participated in a hearing where he was allowed to address "any issue" he desired. *Id.* at 250, 98 S.Ct. 549. At the hearing, extensive testimony from the parties established that the father "provided support only on an irregular basis," "[gave] toys and gifts" to his child "from time to time," and visited his child sporadically for the first eleven years of the child's life. *Id.* at 250–51, 98 S.Ct. 549. Further, the mother testified that the contacts with the father "were having a disruptive effect on the child" and "[t]he child himself expressed a desire to be adopted by [his step-father] and to take on [his stepfather's] name." *Id.* at 251, 98 S.Ct. 549. From this evidence, the trial court found

that an adoptive placement with the child's stepfather was in the best interest of the child. *Id.*

On appeal, the father made both an equal protection and a due process argument that his substantive rights were violated by the application of the best interests of the child standard. *Id.* at 254, 98 S.Ct. 549. The Court rejected the father's claims and stated the father "never exercised actual or legal custody over his child, and thus . . . never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child." *Id.* at 256, 98 S.Ct. 549.

T.B.'s case is factually distinguishable from *Quilloin*. First, unlike the father in *Quilloin*, T.B.'s father had no knowledge, notice, or opportunity to participate in the adoption proceedings and was thus not presented with the same opportunities to be heard as the father in *Quilloin*. *Compare supra* ¶ 8 *with Quilloin*, 434 U.S. at 249–50, 98 S.Ct. 549.

Second, unlike *Quilloin*, T.B.'s father had a very short time period to interact with T.B. before his parental rights were terminated, and thus his opportunity to demonstrate his intent to parent T.B. was significantly more limited. In spite of this limitation, and unlike the father in *Quilloin*, T.B.'s father sought to be T.B.'s parent and at all times "insisted" on being involved in T.B.'s life. In his two-month period with T.B., T.B.'s father took on several parental-like responsibilities relative to the care and protection of his child. *See supra* ¶¶ 6–7. Although T.B.'s father never exercised actual or legal custody of his daughter, his multiple visits each week and his contribution of time and money to the child's upbringing establishes an interaction that was significantly greater than the isolated and sporadic contacts and support of the father in *Quilloin*.

Finally, while throughout the majority's opinion it emphasizes the need for an enduring relationship for "years," *Quilloin* demonstrates that it is the substance and quality of the father's actions that is most critical to the analysis, not the duration of the relationship. Indeed, a focus on the duration contributes to the cruel irony that, while here, the father's claims fail because his parental relationship with T.B. was too brief, in *Quilloin*, the father's relationship fails because it was too long.

**1040**

United States Supreme Court precedent protects an unwed father's opportunity to assume a responsible role in the life of his child, and yet; in this case, the father's parental rights were terminated before the father had much of an opportunity to do so. But the fact that a father has had little time to develop this relationship does not conclusively preclude a relationship from arising. *Lehr* only requires that the putative father take "some measure of responsibility for the child's future," which can be accomplished even over a short duration of time. *See Lehr*, 463 U.S. at 262, 103 S.Ct. 2985.

¶ 57 When I examine the facts of the present case, short of strict compliance with our statutory mandates, it is difficult to imagine what additional measures the father could have undertaken to secure a constitutionally protected parent-child bond with his daughter. As the majority noted, "[t]he putative father was aware of the pregnancy and made attempts to obtain receipts" in an effort to assist with prenatal medical expenses. *Supra*, ¶ 4. He "requested that the natural mother sign a release allowing him access to T.B.'s medical information so that he could monitor T.B.'s progress during the pregnancy." *Id.* ¶ 4. Despite active efforts by the family to exclude him, the father found the mother the day of T.B.'s birth, and was present in the hospital the day his child was born. *Id.* ¶ 5. After T.B.'s birth, the father entered into an agreement to pay child support, visited the child for several hours multiple times a week, "purchased child care supplies," took family pictures with T.B., and at all times "insisted on remaining involved in T.B.'s life." *Id.* ¶¶ 6–7.

¶ 58 T.B.'s father concedes that he did not comply with the four statutory filing requirements that are conditions to including an unwed biological father within the class of persons whose consent must be obtained before a child may be adopted. I would not find the statutory requirements to be unconstitutional, but neither would I make it impossible for a father to establish a constitutionally recognized relationship simply because he failed to strictly comply with the statute. *See Osborne v. Adoption Ctr. of Choice*, 2003 UT 15, ¶ 70, 70 P.3d 58 (Dur-

ham, J., dissenting) ("To terminate [this father's] fully developed parental rights without notice and a hearing, based on strict application of statutory requirements, violates notions of fundamental fairness."). I believe that T.B.'s father "did what was reasonably possible in the time he had.... The law does not intend that impossible requirements be met." *See Escobedo v. Nickita*, 365 Ark. 548, 231 S.W.3d 601, 618–19 (2006)(Hannah, J., dissenting) (citation omitted). It is for these reasons that I decline to join the majority's opinion.

¶ 59 Chief Justice DURHAM concurs in Justice NEHRING'S dissenting opinion.