2012 UT 78

**In re BABY GIRL T., a person under eighteen years of age.**

**R.C.S., Appellant,**

v.

**A.O.L., Appellee.**

No. 20100546.

Supreme Court of Utah.

Nov. 23, 2012.

Daniel S. Drage, Ogden, for appellant.

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellee.

On Certification from the Utah
Court of Appeals

Justice DURHAM, opinion of the Court:

## INTRODUCTION

¶ 1 Ramsey Shaud challenges the district court's determination of his rights as a birth father and its grant of a motion in limine preventing his presentation of evidence. The district court concluded that Mr. Shaud did not comply with the provisions of the Utah Adoption Act and therefore waived the right to notice of any judicial proceeding in connection with the adoption of Baby Girl T., as well as the right to refuse to consent to her adoption. It also barred him from presenting evidence that the reason he failed to comply with requirements of the Act was because state employees negligently failed to register his notice of paternity proceedings prior to the birth mother's execution of a consent to adoption.

¶ 2 We hold that the Act is constitutionally defective as applied to Mr. Shaud and deprived him of "a meaningful chance to preserve his opportunity to develop a relationship with his child," *T.M. v. B.B. (In re Adoption of T.B.)*, 2010 UT 42, ¶ 31, 232 P.3d 1026. We therefore reverse and remand.

## BACKGROUND

¶3 Shasta B. Tew and Mr. Shaud, residents of Florida, engaged in a sexual relationship and conceived Baby Girl T. Ms. Tew learned that she was pregnant in early June of 2009. She informed Mr. Shaud that she was pregnant and told him that the child was his. Mr. Shaud told Ms. Tew that he wanted to participate in all the prenatal doctor appointments, attend the child's birth, and ultimately raise the child. Ms. Tew informed Mr. Shaud that she would place the child for adoption.

¶4 Mr. Shaud attempted to convince Ms. Tew not to give the child up for adoption and that he was capable of caring for the child. Ms. Tew apparently did not respond to most of Mr. Shaud's entreaties. When she did communicate with Mr. Shaud, it was to request that he sign the necessary paperwork to place the child for adoption. In their last telephone communication before the child's birth, Mr. Shaud again insisted that he be allowed to raise the child. In mid-December, Ms. Tew sent Mr. Shaud a letter stating, "I'll be in Arizona and Utah with my family for the holidays and stay on in Utah for a while." Mr. Shaud continued to send Ms. Tew online messages, attempting to convince her to let him have the baby, but Ms. Tew did not respond.

¶5 Presumably based on his belief that Ms. Tew was going to be somewhere in Utah to deliver the child,[1] Mr. Shaud retained Utah counsel in early January to assert his paternity claim and prevent a potential adoption.[2] Mr. Shaud's counsel filed a petition to establish paternity and a sworn affidavit with the district court on January 12, 2010. That same day, Mr. Shaud's counsel also sent via facsimile a copy of the notice of commencement of paternity proceedings to the Office of Vital Records and Statistics of the Utah

Department of Health (Vital Records). Mr. Shaud's counsel also mailed the original notice. According to Mr. Shaud, Vital Records received this mailing two days later, on January 14. He also asserts that the original time stamp on the mailing envelope, indicating receipt on January 14, was later crossed out and that the envelope was re-stamped as received on January 20. Vital Records entered Mr. Shaud's notice into its confidential putative father registry on January 20, 2010, at 9:15 a.m.

¶6 Ms. Tew gave birth to Baby Girl T. on January 15, 2010, nearly a month premature. On January 19, Ms. Tew signed an affidavit consenting to the child's adoption through A Act of Love Adoptions (Act of Love), an adoption agency. Act of Love then contacted Vital Records to determine whether anyone had filed a notice of paternity proceedings. At 8:30 a.m. on January 20, 2010, Vital Records informed Act of Love that it had searched its paternity registry and that "[n]o paternity proceedings have been found pertaining to the child in question." This occurred forty-five minutes before Vital Records entered Mr. Shaud's notice into the registry. Act of Love proceeded with the adoption.

¶7 A few weeks later, Act of Love filed a verified petition for the determination of Mr. Shaud's parental rights, asserting that he had waived any rights regarding the child because his notice was not entered into the Vital Records registry before Ms. Tew executed her consent to the adoption. Mr. Shaud's counsel gathered evidence that Vital Records had been negligent in entering the notice in a timely manner, and that it had strayed from its normal practice of accepting notices sent via facsimile, rather than requiring originals.[3] Act of Love filed a motion in limine to exclude any evidence that Vital

1. Mr. Shaud conceded that Ms. Tew's letter informing him that she would "stay on in Utah for a while" created a qualifying circumstance under Utah Code section 78B-6-122. Accordingly, his consent to the child's adoption was not required unless he satisfied certain requirements of the Act.

2. Mr. Shaud had already filed with putative father registries in Florida and Arizona.

3. Under Utah Code section 78B-15-401(2), "[a] notice of initiation of paternity proceedings may not be accepted into the registry unless accompanied by a copy of the pleading which has been filed with the court to establish paternity." Mr. Shaud did not include a copy of these pleadings with his filing, but Vital Records nonetheless entered Mr. Shaud's notice into the registry on January 20, 2010.

Records was negligent because the Adoption Act explicitly states that a notice of paternity proceedings is not "considered filed [until] it is entered into the registry," UTAH CODE § 78B–6–121(4), and that acts or omissions of third parties do not excuse an unmarried biological father from strictly complying with the Act's requirements, *id.* § 78B–6–106(1). The district court granted the motion and held that Mr. Shaud had relinquished his rights. It concluded that Mr. Shaud had not strictly complied with the Act because his notice of paternity proceedings had not been entered into the Vital Records registry before Ms. Tew consented to the adoption.

¶ 8 Mr. Shaud timely appealed the district court's ruling, and the court of appeals certified the case to this court. We have jurisdiction under UTAH CODE section 78A–3–102(3)(b).

## STANDARD OF REVIEW

¶ 9 "We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." *State v. Parduhn,* 2011 UT 57, ¶ 16, 266 P.3d 765 (internal quotation marks omitted). "Constitutional challenges to statutes present questions of law, which we review for correctness." *State v. Robinson,* 2011 UT 30, ¶ 7, 254 P.3d 183 (internal quotation marks omitted).

## ANALYSIS

¶ 10 Under the Adoption Act, the consent of an unmarried biological father is not required before his child is placed with adoptive parents if the father does not satisfy certain requirements. *See* UTAH CODE § 78B–6–121(3). The requirement central to this appeal is that an unwed father must "file[ ] notice of the commencement of paternity proceedings . . . with [Vital Records], in a confidential registry established by the department for that purpose." *Id.* § 78B–6–121(3)(c). This notice "is considered filed when it is entered [by Vital Records] into the registry." *Id.* § 78B–6–121(4).

¶ 11 The Act's requirements operate under the presumption that an unwed father knows that his "child may be adopted without his consent unless he strictly complies with the provisions of [the Act]." *Id.* § 78B–6–102(6)(f). This court has consistently upheld the Act's strict compliance standard as constitutionally sound. *See, e.g., Sanchez v. L.D.S. Soc. Servs.,* 680 P.2d 753, 755 (Utah 1984) ("It is of no constitutional importance that [an unwed father] came close to complying with the statute."). *But see Thurnwald v. A.E.,* 2007 UT 38, ¶¶ 39–40, 163 P.3d 623 (avoiding an interpretation of the Act that would impose an "uncertain filing period" on an unwed father because it would violate principles of due process). We have upheld the Act's strict compliance standard in part because an unwed father's biological connection to his child does not automatically grant him a fundamental constitutional right to parenthood. Rather, an unwed father has a "provisional right" to parenthood, *Wells v. Children's Aid Soc'y of Utah,* 681 P.2d 199, 206 (Utah 1984), and due process requires only that an unwed father have "a meaningful chance to preserve his opportunity to develop a relationship with his child," *T.M. v. B.B. (In re Adoption of T.B.),* 2010 UT 42, ¶ 31, 232 P.3d 1026.

¶ 12 But we have not had occasion to address whether due process concerns arise when a father's failure to strictly comply with the Act is allegedly due to a state agency's negligence entirely outside his control. "[A] statute fair upon its face may be shown to be void and unenforceable as applied." *In re Adoption of Baby Boy Doe,* 717 P.2d 686, 689 (Utah 1986) (internal quotation marks omitted). As mentioned above, the Act requires that an unwed father file notice of the commencement of paternity proceedings with Vital Records, and this notice is "considered filed" only upon Vital Records' entry of the notice into its confidential registry. Mr. Shaud contends that he provided facsimile and original copies of his notice to Vital Records prior to Ms. Tew's execution of a consent to adoption. However, due to Vital Records' alleged negligence, Mr. Shaud's notice was not entered into the registry until after Ms. Tew executed her consent. The district court concluded that Mr. Shaud did not strictly comply with the Act because his notice was not timely filed and that any acts

or omissions by Vital Records did not excuse his failure to strictly comply with the Act.

¶ 13 This is an "exceptional case." *In re Adoption of T.B.*, 2010 UT 42, ¶ 42, 232 P.3d 1026 (internal quotation marks omitted). At the outset we note that, as this case demonstrates, the statute creates an anomaly: a putative father is charged with strict compliance with a requirement he has no power to fulfill. While he may control the delivery of the notice to Vital Records, only the agency may enter it in the registry, which is the actual act of "filing." Therefore, when the statute purports to require the father to "file," it is requiring an act he has no legal or actual ability to do.

¶ 14 Under the district court's interpretation of the Act, an unwed father does not strictly comply with the Act if he does everything in his power to achieve compliance—such as filing all the appropriate paperwork with Vital Records several days, weeks, or months before a birth mother's consent to adoption—but Vital Records nonetheless fails to register his notice prior to the mother's consent to adoption. This interpretation would extend to mere negligence by Vital Records, such as misplacing an unwed father's notice, as well as to a hypothetical conscious decision to delay the father's entry into the registry.[4] As discussed below, we see due process problems if provisions of the Act were read to allow a state agency's negligence to cut off an unwed father's opportunity to develop a relationship with his child.

¶ 15 Act of Love also contends that Mr. Shaud did not preserve this due process argument in the district court. It argues that "Mr. Shaud made vague references to his constitutional parental rights and argued that application of the Act was unfair, [but] he did not specifically raise the issue or present legal authority in support of his position prior to the district court's determina-

tion of his parental rights." After reviewing the record, we conclude that Mr. Shaud adequately preserved the due process issue.

## I. DUE PROCESS

¶ 16 The U.S. and Utah Constitutions mandate that when life, liberty, or property is placed in jeopardy by reason of state action, due process must be accorded the individual affected by such action. U.S. CONST. amend. XIV; UTAH CONST. art. 1, § 7. The bare essentials of due process have been characterized as notice of the proposed action of deprivation "and an opportunity to be heard in a meaningful manner." *Chen v. Stewart*, 2004 UT 82, ¶ 68, 100 P.3d 1177. This constitutional protection "is not a technical conception with a fixed content unrelated to time, place, and circumstances; it is flexible and requires such procedural protections as the particular situation demands." *Worrall v. Ogden City Fire Dep't*, 616 P.2d 598, 602 (Utah 1980) (plurality opinion).

¶ 17 To determine whether a legislative enactment improperly deprives a person of due process protections, this court has looked to the U.S. Supreme Court's test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 339–50, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). *See, e.g., McBride v. Utah State Bar*, 2010 UT 60, ¶ 20, 242 P.3d 769.

[The] *Mathews* [test] dictates that the process due in any given instance is determined by weighing "the private interest that will be affected by the official action" against the Government's asserted interest, "including the function involved" and the burdens the Government would face in providing greater process. The *Mathews* calculus then contemplates a judicious balancing of these concerns, through an analysis of "the risk of an erroneous deprivation" of the private interest if the process were reduced and the "probable value, if

---

**4.** Act of Love suggests this is the proper interpretation because an unwed father "is not excused from strict compliance ... based upon any action, statement, or omission of the other parent or third parties." UTAH CODE § 78B–6–106(1). This provision cannot, however, be reasonably interpreted to encompass state agencies as "third parties." To do so would allow an end run around due process protections. Whether Mr.

Shaud was denied due process as a result of Vital Records' allegedly negligent conduct is a constitutional assessment for this court to make. As discussed below, we have grave concerns on this score, and any violation of due process cannot be excused by a statutory provision purportedly allowing a state agency to cut off citizens' rights through negligent acts.

any, of additional or substitute procedural safeguards."

*Hamdi v. Rumsfeld,* 542 U.S. 507, 529, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion) (quoting *Mathews,* 424 U.S. at 335, 96 S.Ct. 893). The U.S. Supreme Court has found this test "useful in deciding what specific safeguards the Constitution's Due Process Clause requires in order to make a civil proceeding fundamentally fair." *Turner v. Rogers,* —— U.S. ——, 131 S.Ct. 2507, 2517, 180 L.Ed.2d 452 (2011). Moreover, our legislature has recognized the due process concerns that arise in the adoption context, stating that "the rights and interests of all parties affected by an adoption proceeding must be considered and balanced in determining what constitutional protections and processes are necessary and appropriate." UTAH CODE § 78B–6–102(3). We now discuss the interests at stake in this appeal.

### A. Mr. Shaud's Interest

■ ¶ 18 Mr. Shaud's interest as an unmarried biological father is in having an opportunity to establish a relationship with his biological child. "Under both federal and state law, an unwed biological father has an inchoate interest in a parental relationship with his child that acquires full constitutional protection only when he 'demonstrates a full commitment to the responsibilities of parenthood by [coming] forward to participate in the rearing of his child.'" *Thurnwald v. A.E.,* 2007 UT 38, ¶ 25, 163 P.3d 623 (alteration in original) (quoting *Lehr v. Robertson,* 463 U.S. 248, 261 & n. 17, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983)). These "constitutionally protectable [p]arental rights do not spring full-blown from the biological connection between parent and child. They require rela-

tionships more enduring." *T.M. v. B.B. (In re Adoption of T.B.),* 2010 UT 42, ¶ 30, 232 P.3d 1026 (alteration in original) (quoting *Lehr,* 463 U.S. at 260, 103 S.Ct. 2985). Thus, the mere biological connection between an unwed father and his child does not, without more, grant the father a protected liberty interest. *See id.*[5]

■ ¶ 19 However, we have stated that an unmarried biological father must be given "an adequate opportunity to comply with the[ ] statutory requirements" of the Adoption Act in order to assert this interest. *Id.* ¶ 44. This is because "an unwed father's opportunity interest in developing a relationship with his newborn [is] a provisional right that is itself protected by the due process clause of the Utah Constitution."[6] *Thurnwald,* 2007 UT 38, ¶ 28, 163 P.3d 623 (internal quotation marks omitted). "So long as a state's adoption code contains procedures that provide a putative father a meaningful chance to preserve his opportunity to develop a relationship with his child, due process is satisfied." *In re Adoption of T.B.,* 2010 UT 42, ¶ 31, 232 P.3d 1026. In *In re Adoption of T.B.,* we specifically noted that

> the constitution requires that the state provide meaningful procedures through which the father may protect his opportunity to [develop a substantial relationship with his child].... [D]ue process guarantees an unwed natural father the right to preserve his parental opportunity by following state procedures. If he fails to comply with the procedures available to protect his right to develop an enduring, committed relationship with his child, a putative father risks the possibility that the natural mother's relinquishment of the

---

5. It is worth noting that as of 2009, the CDC's National Center for Health Statistics reported that the percent of all births to unmarried women in the United States was forty-one percent. Many of those children are raised in single parent households, some in two parent households, and some in adoptive families. There may well be an extent to which policies predicated on the notion that unwed fathers are universally uninterested in their offspring or unwilling to embrace parenthood—even when unwed mothers on occasion are not—are being overtaken by stark, if regrettable, changes in public attitudes toward marriage.

6. In this respect, our analysis is not tethered to a recognized liberty interest such as those in other familial contexts. For example, this is not a case in which the state is impinging on a father's "protected liberty interest in the care, custody and control" of his child. *Gomes v. Wood,* 451 F.3d 1122, 1127 (10th Cir.2006). Instead, this case involves a father's protected liberty interest in the opportunity to preserve a relationship with his child.

child may eliminate his opportunity to acquire constitutionally protectable parental rights before he has been able to obtain them.

*Id.* ¶ 40 (footnote omitted).

¶ 20 Mr. Shaud's private interest therefore is in the *opportunity* to develop a substantial relationship with Baby Girl T. The Act must give him a meaningful and adequate procedure to protect this interest. If the Act *does* give him a meaningful chance to protect his interest, he may not complain of the termination of his interest when he fails to strictly comply with its procedures.

### B. The State's Interest

¶ 21 The legislature has expressed that the state's interest in the adoption context is "in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children." UTAH CODE § 78B–6–102(5)(a). In this respect, "it is beyond dispute that the state must ... have legal means to ascertain within a very short time of birth whether the biological parents (or either of them) are going to assert their constitutional rights and fulfill their corresponding responsibilities, or whether adoptive parents must be substituted." *Thurnwald,* 2007 UT 38, ¶ 34, 163 P.3d 623 (alteration in original) (internal quotation marks omitted). Moreover, the state has "compelling interests in promoting early and uninterrupted bonding between child and parents and in facilitating final and irrevocable adoptions." *Id.* (internal quotation marks omitted).

### C. The Act's Balancing of Interests

¶ 22 As previously discussed, an unwed biological father must "file" a notice of paternity proceedings with Vital Records, and this notice is "considered filed" [7] when Vital Records enters the notice into its confidential registry. UTAH CODE § 78B–6–121(3)(c), (4). Thus, the Act refers to two separate "filings,"

only one of which qualifies to trigger protections for the putative father's interest. Unfortunately, the father's filing, which he can control, does not qualify; only Vital Records' acts do.

¶ 23 We have noted that, under previous versions of the Adoption Act requiring registration with Vital Records, the registry was intended to serve as "a procedure that would protect the putative father's parental rights if he timely claimed his paternity" and to "strike a balance between two competing interests." *Thurnwald,* 2007 UT 38, ¶ 29, 163 P.3d 623 (internal quotation marks omitted). The competing interests are those discussed above, namely "the significant state interest in speedily placing infants for adoption and the constitutionally protected rights of putative fathers." *Id.* (internal quotation marks omitted).

¶ 24 Mr. Shaud alleges, however, that he attempted to use the registry to protect his parental rights in a timely fashion, but that Vital Records negligently delayed the entry of his notice into the registry until after Ms. Tew had consented to the adoption. He argues that the district court's interpretation of the Act permits Vital Records' negligence, over which he had no control and of which he had no notice, to extinguish his opportunity to establish a relationship with his child.

¶ 25 We conclude that the district court's interpretation of the Act's strict compliance standard poses an unacceptable risk of erroneous deprivation of unwed fathers' rights. Moreover, we consider it "unnecessary to the state's compelling interests" that a father's notice of paternity proceedings be deemed filed at the time it is entered into the confidential registry. *Id.* at ¶ 39. As noted above, we have previously sanctioned the Act's procedural requirements as not violative of due process. In each of these instances, however, the father's failure to strictly comply with the Act was in some measure due to his own inaction, and not to failures of state-controlled process. *See In re Adoption of T.B.,* 2010 UT 42, ¶¶ 26, 44, 232 P.3d 1026

---

7. As noted above, the statute creates two separate acts of "filing." *Supra* ¶¶ 12–13. The father's timely delivery of the documents to Vital Records is necessary but legally insufficient to constitute "filing" for purposes of protecting his rights. Only Vital Records can accomplish that act of "filing."

(holding that a "putative father's constitutional rights were not violated" where it was "undisputed that the putative father did not comply with a number of [the Act's] requirements"); *In re I.K.*, 2009 UT 70, ¶ 9, 220 P.3d 464 ("In this case, it is undisputed that the Natural Father did not comply with the first set of Utah's statutory requirements."); *O'Dea v. Olea*, 2009 UT 46, ¶ 45, 217 P.3d 704 (noting that a putative father did not complete the requirements to establish paternity until eighty days after a qualifying circumstance existed); *C.F. v. D.D. (In re Adoption of B.B.D.)*, 1999 UT 70, ¶ 12, 984 P.2d 967 (noting that an unwed father "failed to make any attempt to establish legal paternity under the provisions of [the Act]"); *Sanchez v. L.D.S. Soc. Servs.*, 680 P.2d 753, 755 (Utah 1984) (describing an unwed father's attempt to register with Vital Records after the birth mother consented to the child's adoption); *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 207–08 (Utah 1984) (describing an unwed father's "sufficient opportunity" and failure to assert paternity, "including ample advance notice of the expected time of birth and the fact that the mother intended to relinquish the child for adoption, advice of counsel on filing the required form, and a copy of the [necessary] form"). Under the Act, a putative father is intended to be the master of his own destiny; he may not argue constitutional unfairness where his parental rights are terminated due to his *own* failure to comply with the Act.

¶ 26 In this instance, however, the allegation is that negligent actions by a *state agency* have prevented notice from being filed, resulting in the deprivation of a putative father's opportunity interest in establishing a relationship with his child. Mr. Shaud's allegations therefore present a much different case. *Cf. In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689, 691 (Utah 1986) (holding that an unwed father had shown "that the termination of his parental rights was contrary to basic notions of due process," but also noting that "[i]n all but the most exceptional cases" the Act achieves the appropriate constitutional balance).

¶ 27 We have expressed concern where an unwed father does not have a "guaranteed window" in which to protect his rights. *Thurnwald*, 2007 UT 38, ¶ 40, 163 P.3d 623. "[A] firm cutoff date is reasonable, if not essential" in the adoption context, *Sanchez*, 680 P.2d at 755, and a putative father must be "certain of when he must … register with [Vital Records] in order to preserve his rights," *Thurnwald*, 2007 UT 38, ¶ 35, 163 P.3d 623. It is true that Mr. Shaud in theory could be certain regarding when his notice of paternity proceedings would legally be "deemed filed," namely on the date that Vital Records entered his notice into the registry. However, Mr. Shaud could never be certain on what date, in relation to his own filing, Vital Records would *complete* the act of registering his notice, and he therefore could not be certain when his liberty interest would be protected under the Act. In theory, he could have filed months before the child's birth, but still be unprotected if Vital Records failed to act to put his notice in the registry.

¶ 28 This is an unacceptable result. "Utah's registration statute was designed to facilitate permanent and secure placements for newborn children whose unwed fathers take no steps to identify themselves promptly and acknowledge paternity," *Sanchez*, 680 P.2d at 756 (Durham, J., dissenting), not to penalize those fathers who have done all in their power to comply with the Act prior to a mother's consent to adoption. It would "fl[y] in the face of fundamental fairness and due process" to allow a state agency's inaction "to cut off the rights of fathers who are identified and present" and have complied with the Act to the extent they are capable.[8] *In re*

---

8. Act of Love argues that Mr. Shaud did not do all in his power to strictly comply with the Adoption Act's requirements. Utah Code section 78B–15–401(2) provides that "[a] notice of initiation of paternity proceedings may not be accepted into [Vital Records'] registry unless accompanied by a copy of the pleading which has been filed with the court to establish paternity." Mr. Shaud acknowledges that he did not include a copy of his paternity petition with the notice he sent to Vital Records.

This argument is unpersuasive for several reasons. First, the district court specifically noted that Mr. Shaud's failure to provide a copy of the paternity petition was "not the basis of the Court's ruling." Second, section 78B–15–401 governs Vital Records' maintenance of records, and subsection 2 imposes a duty upon *it* not to

*K.B.E.*, 740 P.2d 292, 296 (Utah Ct.App.1987) (internal quotation marks omitted); *see also Thurnwald*, 2007 UT 38, ¶ 38, 163 P.3d 623.

¶ 29 Additional or substitute procedural safeguards could easily remedy the problem of an uncertain deadline. With additional safeguards, the state could remove Vital Records' discretion and provide unwed fathers with certainty regarding when they will have satisfied the requirement that they file a notice of paternity proceedings. Various states have taken steps to provide such certainty. *See, e.g.*, IDAHO CODE ANN. § 16–1513(2) ("The department shall record the date and time the notice of the commencement of proceedings is filed with the department. The notice shall be deemed to be duly filed with the department as of the date and time recorded on the notice by the department."); MONT.CODE ANN. § 42–2–206(1) ("In order to be entitled, because of registration, to receive notice of a termination of parental rights proceeding, a putative father's registration form ... must be received by the department not later than 72 hours after the child's birth."); NEB.REV.STAT. § 43–104.02 ("[A] notice shall be considered ... filed if it is received by the department or postmarked prior to the end of the [statutory deadline].").[9]

¶ 30 Moreover, we have previously noted that when the Act is interpreted in ways that promote uncertainty, such an "interpretation actually works against, rather than promotes, the state's compelling interest in permanent adoptions." *Thurnwald*, 2007 UT 38, ¶ 40, 163 P.3d 623. A "firm cutoff date benefits all parties if it is tied to a certain time period after the child's birth." *Id.* This is because "[i]f the rights of unwed fathers are well defined, it will be more difficult for fathers to mount as-applied constitutional challenges to the deprivation of their rights." *Id.*

¶ 31 To provide Mr. Shaud "a meaningful chance to preserve his opportunity to develop a relationship with his child," *In re Adoption of T.B.*, 2010 UT 42, ¶ 31, 232 P.3d 1026, it is unacceptable to apply the statute's "considered filed" language to Mr. Shaud. Rather, we hold that Mr. Shaud's notice must be considered filed when Vital Records *received* it, because, at that point, Mr. Shaud had done all that he could do to strictly comply with the Act.[10] We recognize the state's competing interest in providing mothers and adoptive parents with notice, within a short time, of whether a putative father has attempted to preserve his paternal rights. However, "the Constitution recognizes higher values than speed and efficiency," *Stanley v. Illinois*, 405 U.S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), and due process is "flexible and requires such procedural protections as the particular situation demands." *Worrall*, 616 P.2d at 602 (plurality opinion). Deeming Mr. Shaud's notice filed when Vital Records received it provides certainty to Mr. Shaud in protecting his interest in developing

accept birth fathers' notices without a copy of their paternity petitions. In contrast, the statutory requirement placed upon unwed biological fathers states only that they must file "notice of the commencement of paternity proceedings" with Vital Records. UTAH CODE § 78B–6–121(3)(c). Finally, and most importantly, Vital Records *did* register Mr. Shaud's notice. The question, then, is not whether Mr. Shaud complied with the requirements of section 78B–6–121, but rather *when* he complied with its requirements.

9. We are unaware of any state statutes, other than Utah's, that define a putative father's time of filing as the time of an agency's entry of the father's notice into its registry. Most appear to contemplate the term "file" in its ordinary sense: submission by the putative father to the agency. *See, e.g.*, ALA.CODE § 26–10C–1(a)(2) (requiring a state agency to establish a registry with information on individuals who have "filed with the

registry before or after the birth of a child born out of wedlock, a notice of intent to claim paternity of the child"); ARIZ.REV.STAT. ANN. § 8–106.01(A)–(B) (requiring putative fathers to "file notice of a claim of paternity" "with the state registrar of vital statistics" in order to "receive notice of adoption proceedings"); ARK.CODE ANN. § 20–18–702(b)(1) ("Upon receipt of a written statement signed and acknowledged by the registrant before a notary public, the registry shall record ... [t]he date and time of receipt, which the division shall note on the written statement signed and acknowledged by the registrant."); FLA. STAT. § 63.054(1) ("In order to preserve the right to notice and consent to an adoption ... an unmarried biological father must ... file a notarized claim of paternity form with the Florida Putative Father Registry....").

10. We recognize that the legislature can further adjust the definition of "filed," so long as it meets constitutional requirements.

a relationship with his daughter and renders the civil proceeding determining Mr. Shaud's parental rights "fundamentally fair." *Turner*, 131 S.Ct. at 2517.

¶ 32 We conclude that the district court's decision allowing Mr. Shaud's notice to be considered filed only when Vital Records entered it into the registry violated his due process rights and cannot stand.[11] We therefore remand this case to the district court for resolution of the question of whether Vital Records received Mr. Shaud's notice of paternity proceedings prior to the birth mother's consent to the adoption.

## II. PRESERVATION

¶ 33 As noted above, an argument has been made in this case that Mr. Shaud's due process claim should not have been reached because it was not properly preserved. We disagree. Although we recognize that Mr. Shaud failed to expressly articulate the due process clause as the basis of his constitutional claim, we will not penalize him for failing to use the magic words "due process" when the record clearly demonstrates his argument was founded in the due process clause.

¶ 34 "In order to preserve an issue for appeal[,] the issue must be presented to the [district] court in such a way that the [district] court has an opportunity to rule on that issue." *Johnson v. State*, 2011 UT 59, ¶ 9 n. 6, 267 P.3d 880 (alterations in original) (internal quotation marks omitted). A party asserting error on appeal must have (1) raised the issue "in a timely fashion" in the lower court, (2) "specifically raised" the issue,

and (3) introduced "supporting evidence or relevant [legal] authority." *Warne v. Warne*, 2012 UT 13, ¶ 16, 275 P.3d 238 (internal quotation marks omitted). We have also stated that "[f]or an issue to be sufficiently raised, *even if indirectly*, it must at least be raised to a level of consciousness such that the trial judge can consider it." *Weiser v. Union Pac. R.R. Co.*, 2010 UT 4, ¶ 14, 247 P.3d 357 (alteration in original) (emphasis added) (internal quotation marks omitted).

¶ 35 As discussed above, the critical issue in this appeal is whether the district court interpreted the Adoption Act in such a way that Mr. Shaud's due process rights were violated. Mr. Shaud argued to this court that "[i]t is unconstitutional and a violation of the notion of fairness and due process if Mr. Shaud is blamed for failing to 'file' his Notice when the only agency empowered to actually 'file' the Notice was grossly negligent in not timely filing it when received." We look to the record to determine whether this issue was sufficiently identified in the district court. In doing so, we note the following material from the record below:

- In Act of Love's Verified Petition for Determination of Birth Father's Rights, it noted that this court has "made it clear that *strict compliance* [with the Adoption Act] ... is required." It cited Utah cases supporting this proposition, all of which discuss the due process implications of requiring a putative father to comply with the Act.[12] Quoting *Sanchez v. L.D.S. Social Services*, Act of Love also noted that it was of "no constitutional importance" that Mr. Shaud "came

---

11. Vital Records may have methods to satisfy the notice interests of all parties. For example, when a prospective adoptive parent inquires whether a putative father is in the registry, Vital Records could inform the prospective parent that it has received a notice but that it has not yet processed that notice to determine whether the putative father has strictly complied with the filing requirements of the Act.

12. *See C.F. v. D.D. (In re Adoption of B.B.D.)*, 1999 UT 70, ¶¶ 13–18, 984 P.2d 967 (holding that requiring a father to strictly comply with the requirements of the Act was not a violation of his due process rights); *Sanchez v. L.D.S. Soc. Servs.*, 680 P.2d 753, 755 (Utah 1984) (rejecting a puta-

tive father's argument that a provision of the Act "does not provide for actual notice of the statutory procedure for establishing his parental rights, [and] denies him a liberty without due process of law"); *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 207 (Utah 1984) ("[W]e hold that [the statutory] provisions for terminating the parental right of the unwed father of a newborn infant are facially valid under the Due Process Clause in Art. I, § 7 of the Utah Constitution."); *In re Adoption of W.*, 904 P.2d 1113, 1121–22 (Utah Ct.App.1995) (rejecting a putative father's argument that "his due process rights were violated by the process that terminated his parental rights").

close to complying with the statute." 680 P.2d 753, 755 (Utah 1984).

- Act of Love further cited to *Thurnwald v. A.E.*, 2007 UT 38, 163 P.3d 623. There, we held that a strict interpretation of the Act would deprive a putative father of a guaranteed filing period and violate his due process rights. *Id.* ¶¶ 25–40.

- In response, Mr. Shaud distinguished Act of Love's cited case law by arguing that "Mr. Shaud properly complied with the Utah Code" and that any noncompliance was due to "the inept, inadequate and careless acts of the State of Utah [and] its employee, which is entirely and completely out of his control."

- Act of Love then moved for leave to file an over-length memorandum in response. It noted that "Mr. Shaud has raised novel arguments and issues of first impression" regarding "a notice of commencement of paternity proceedings that all agree was not timely entered on the Utah registry ... but which Mr. Shaud claims was received by ... Vital Records before the birth mother ... relinquished her rights to the child."

- In Act of Love's memorandum, it argued that "[b]y requiring actual entry of the notice in the registry, the statute furthers the state's *compelling interests* in preventing the disruption of adoptive placements." (Emphasis added.) It further noted that in *Thurnwald* this court "held that requiring compliance within one full business day following the child's birth comports with the *requirements of due process.*" (Emphasis added.) Citing *Sanchez*, Act of Love again noted that "[i]t is of no constitutional impor-

tance that [Mr. Shaud] came close to complying with the statute."

- Act of Love then filed a motion in limine to exclude evidence regarding when Vital Records received the paternity notice. In Mr. Shaud's opposition motion, he discussed the Adoption Act's legislative finding that "the rights and interests of all parties affected by an adoption proceeding must be considered and balanced in determining what *constitutional protections and processes* are necessary and appropriate." UTAH CODE § 78B–6–102(3) (emphasis added). He also recited the legislature's findings that "an unmarried biological father has an inchoate interest that acquires *constitutional protection* only when he demonstrates a timely and full commitment to the responsibilities of parenthood" and that the Act "has prescribed the conditions for determining whether an unmarried biological father's action is sufficiently prompt and substantial to require *constitutional protection.*" *Id.* § 78B–6–102(5)(e), (6)(a) (emphases added).

- Mr. Shaud also argued that "gross negligence cannot undermine the *constitutional protections* that the adoption code affords [him] for doing everything within his power to comply with the adoption code." (Emphasis added.) He asserted that he should "be afforded the maximum *constitutional protection* as a putative father" and that evidence of Vital Records' negligence "is relevant to establish ... that Mr. Shaud could do nothing more to protect his *constitutional rights* as a putative father." [13] (Emphases added.)

---

13. During the hearing on Act of Love's motion in limine, Mr. Shaud's counsel also referenced the constitutional implications of the issue before the court, as follows:

The Supreme Court of this state [and] the Supreme Court of the United States [have] routinely said once a [putative] father ... takes the steps and complies with those steps, he's afforded the absolute constitutional protection that he's entitled to. This is not just constitutional, this is inherent, your right to raise a child, your right to father a child and be there for the child.... In this particular case Mr. Shaud did everything,

and so he's entitled to the maximum protection of the law.

. . . .

Mr. Shaud has strictly complied.... Because the law gives him that maximum constitutional protection, it allows this Court to say no, you did what you did. The State failed to do what they were supposed to do.... You're entitled to a hearing. You're entitled to rights to your young daughter.

. . . .

[W]hy do we have the State of Utah entering these notices? Why are we giving them the sole power to do this if they're going to sit on it for

• Finally, after the district court granted Act of Love's motion in limine and entered an order terminating Mr. Shaud's parental rights, he filed a motion for the court to reconsider its decision and specifically raised the due process issue.[14] He stated that the "tragic result" of the court's decision "is that putative fathers like Mr. Shaud, who have done everything they physically and legally can do to preserve their rights will have their inherent and constitutional right to raise their children terminated." He further argued that the court appeared to favor "procedure instead of protecting the inherent constitutional rights of Mr. Shaud" and that it failed to recognize "that a putative father has an opportunity interest in developing a relationship with his newborn and that this right is protected by the *due process clause of the Utah Constitution.*" (Emphasis added.) (Internal quotation marks omitted.) [15]

¶ 36 On this record, we conclude that a due process issue was adequately preserved in the trial court notwithstanding Mr. Shaud's failure to use the words "due process" until his motion to reconsider. The briefing in the district court was infused with due process implications, arguments, and cases. Act of Love repeatedly stated that requiring Mr. Shaud's strict compliance did not pose constitutional concerns, and it suggested to the court that it was not a violation of due process to require strict compliance. Both parties repeatedly cited cases that discussed the interaction of the Act's requirements and due process. The *Thurnwald* case, discussed by both parties, focused explicitly on interpreting strict compliance with the Act so as to avoid due process implications that arise when a father's compliance is not within his power.

¶ 37 Moreover, Mr. Shaud repeatedly made due process arguments, although they were not labeled as such. He noted that courts must balance the rights of all parties to an adoption proceeding to determine "what constitutional protections and processes" are necessary. As discussed above, this balancing of interests is the general test for determining whether a law improperly infringes on an individual's due process rights. *See Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *accord McBride v. Utah State Bar,* 2010 UT 60, ¶¶ 19–20, 242 P.3d 769. Mr. Shaud also argued to the district court, as he does to this court, that he could have done nothing more to strictly comply with the Act and to have protected his constitutional rights as a putative father.

¶ 38 These are the same arguments that Mr. Shaud asks us to resolve today. Their only shortcoming below was that Mr. Shaud did not use the phrase "due process" until his motion to reconsider. Whether a party has properly preserved an argument, however, cannot turn on the use of magic words or phrases. *See Pardue v. State,* 252 S.W.3d 690, 699 (Tex.Ct.App.2008) ("Although [the defendant] failed to employ the magic words 'due process' in her objection at trial, [her] objection was sufficient to make the trial court aware of the nature of the complaint and [she] secured an adverse ruling."); *Eddleman v. McKee,* No. 04–70830, 2005 WL 5416768, at *3 n. 2 (E.D.Mich. Mar. 22, 2005) ("The preservation of the claim of a Constitutional violation should not hinge upon insertion of certain 'magic words,' but should, instead, rely upon the common judicial sense of those charged with enforcing the basic rights it affords."), *aff'd,* 471 F.3d 576 (6th Cir.2006), *overruled on other grounds by Fry v. Pliler,* 551 U.S. 112, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). If a party were to assert

... seven days? ... [T]hat is the State, the agencies and everyone involved saying, "Well, we're going to give lip service to the inherent constitutional right of Mr. Shaud to raise this child," ... only to have the State of Utah fall short and say, "Too bad."

14. Although Mr. Shaud explicitly highlighted the due process issue in this motion to reconsider, we have discouraged such motions and have

insisted that the practice of filing such motions "come[ ] to an end." *Gillett v. Price,* 2006 UT 24, ¶ 8, 135 P.3d 861. As the district court did not rule on Mr. Shaud's motion to reconsider, the motion itself does not independently preserve the due process issue for appeal.

15. Mr. Shaud cited *Thurnwald,* 2007 UT 38, 163 P.3d 623, for this proposition.

below that a law discriminated against his sex in violation of his constitutional rights and cited *United States v. Virginia,* 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), we would not fault him for failing to utter the words "equal protection." This would carry the preservation requirement too far.

¶ 39 Here, the district court was presented with arguments about due process and a putative father's constitutional rights in a relationship with his child, case law discussing at length the interplay between the Act's strict compliance standard and constitutional due process, and the general question of whether it was fair to Mr. Shaud to lose the opportunity to establish a relationship with his child because of a state agency's alleged negligence. All of this presented a clear "opportunity to address the claimed error, and if appropriate, correct it." *Patterson v. Patterson,* 2011 UT 68, ¶ 15, 266 P.3d 828 (internal quotation marks omitted). It was "sufficiently raised, even if indirectly," in that it was "raised to a level of consciousness such that the trial judge [could] consider it." *Weiser,* 2010 UT 4, ¶ 14, 247 P.3d 357 (internal quotation marks omitted).

## CONCLUSION

¶ 40 On the alleged facts in this case, Mr. Shaud's notice cannot be considered filed only upon its entry into Vital Records' registry. This definition of "filed" creates unfair uncertainty as to the proper filing date and infringes upon Mr. Shaud's opportunity interest in protecting his relationship with his daughter. Due process requires that we consider Mr. Shaud's notice to have been filed when Vital Records actually received it. We therefore reverse the district court's ruling and remand this case for resolution as to whether Vital Records received Mr. Shaud's notice prior to the birth mother's consent to the adoption.

Justice DURHAM authored the opinion of the Court, in which Associate Chief Justice NEHRING, and Justice PARRISH joined.

Justice LEE filed a dissent, in which Chief Justice DURRANT joined.

Justice LEE, dissenting:

¶ 41 The court today strikes down a provision of the Utah Adoption Act on constitutional grounds. It undertakes this significant step in a case in which the statute's constitutionality was never called into question in the district court and in which we can (and should) resolve the case on statutory grounds. I respectfully dissent because the constitutional issue was not properly preserved by the parties and this is not an appropriate case for us to reach out to resolve it.

¶ 42 Preservation rules are an essential part of our adversary system. In the interests of efficiency, fairness, and justice, appellate courts generally consider only those issues that were specifically raised and resolved in the trial court. *See State v. Low,* 2008 UT 58, ¶ 17, 192 P.3d 867. This general rule advances judicial economy by allowing the first court to hear a case to avoid the necessity of an appeal; it assures fairness by exempting a party from the inequity of having to defend on appeal on a ground that it had no opportunity to address at trial; and it enhances justice by preserving for appellate courts the benefit of the analysis and record developed in the court below.

¶ 43 The court undermines these interests and distorts the law of preservation in its decision today. First, the court reads far too much into the arguments Shaud presented in the district court; he never preserved a constitutional challenge to the Adoption Act, and the court's contrary conclusion stretches the requirement of preservation beyond recognition. Second, the constitutional question addressed by the court is not properly before us in any event, as there is a statutory ground for affirmance that forecloses evaluation of the due process issue.

I

¶ 44 The law generally limits the issues on appeal to those that were specifically presented to the district court. The requirement of preservation is met if the lower court is given a meaningful opportunity to address the issue that is pressed on appeal. *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346. This

implies a duty of specificity in the trial court. An objection on one legal ground, for example, "does not preserve for appeal any alternative grounds for objection." *Low*, 2008 UT 58, ¶ 17, 192 P.3d 867. If the alternative basis was not presented in the lower court, then that court never had a meaningful opportunity to rule on the issue and it was not properly preserved for appeal. *Id.*

¶ 45 Shaud failed to preserve a challenge to the constitutionality of the filing standard in the Adoption Act, UTAH CODE § 78B-6-121(4). At no point in the proceedings below did Shaud assert a claim challenging this provision on constitutional grounds. He complained that its application in this case resulted in an inequity, insisting that he had done everything within his power to protect his parental rights. *See supra* ¶ 35. And he asserted that the untimely filing of his notice of commencement of paternity proceedings resulted from the "inept, inadequate and careless acts of the State of Utah [and] its employee, which [were] entirely and completely out of his control." *Supra* ¶ 35 (first alteration in original). Those challenges, however, were framed in terms that simply questioned the fairness of the statutory scheme on policy grounds. Shaud never identified any basis for striking the statute down on constitutional grounds.

¶ 46 The majority never really suggests otherwise. The contentions that are bullet-pointed in its opinion do not include any request, express or implied, that the trial court strike any provision of the Adoption Act as unconstitutional. Instead, the listed contentions simply make general references to the constitutional rights implicated by the Adoption Act and raise vague concerns of unfairness. Specifically, the majority notes that (a) Act of Love asserted in the district court that it was of "no constitutional importance" that Shaud "came close to complying" with the Adoption Act; (b) Shaud responded by insisting that he did everything within his power to comply with the Adoption Act and any filing noncompliance resulted from the State's careless acts; (c) Act of Love's rebuttal relied on the State's "compelling interests in preventing the disruption of adoptive placements" and reiterated that almost com-

plying with the Act "is of no constitutional importance"; (d) Act of Love filed a motion in limine seeking to exclude evidence of the timing of the State's receipt of the paternity notice, while Shaud's response recited legislative findings recognizing the need to consider the "inchoate interest[s]" of unmarried biological fathers meriting "constitutional protection" upon demonstrating "a timely and full commitment to the responsibilities of parenthood"; and (e) Shaud argued that "gross negligence cannot undermine the constitutional protections that the adoption code affords for doing everything within his power to comply with the adoption code." *Supra* ¶ 35.

¶ 47 None of this comes close to a claim challenging the constitutionality of the filing provision of the Adoption Act or a request that it be deemed unconstitutional. Many of the cited invocations of the constitution were by Act of Love, in the form of a general defense to the statute's constitutionality. Those assertions cannot possibly be construed to satisfy Shaud's responsibility to give the district court an opportunity to rule on the question whether the Act's filing provision runs afoul of the Due Process Clause. In fact, they cut decisively the other way. When Act of Love went out of its way to vaguely defend the statute's constitutionality, that should have underscored for Shaud the need—if he saw one—to squarely present a constitutional claim.

¶ 48 This he failed to do. In the pleading Shaud filed in the district court, he requested no relief that involved striking any statutory provision on constitutional grounds. Instead, he sought only the entry of an order "determining that he ha[d] strictly and fully complied with Utah Code in filing his Petition for Paternity and Notice of Commencement of Paternity Proceedings with the State of Utah as required ... so as to preserve and protect his rights as a father." Thus, Shaud's contentions in the district court amounted to a plea to ignore the statute's literal language in light of his concerns about the equities at stake. When Shaud complained that he had done everything within his control, he was not asserting the due process point that the court today embraces in its opinion. He was

simply suggesting that the court ignore his failure to comply with the statute in light of the blameworthy conduct of the State (in its "inept, inadequate and careless acts"). Yet absent a constitutional basis for striking the statute down, Shaud left the district court with no choice but to ignore his complaints about inequity and to enforce the statute as written. The district court, like any court, was obligated to enforce the statute as written even if it disagreed with it or deemed it unfair. Shaud's vague fairness argument was thus insufficient to give the district court a meaningful opportunity to rule on the constitutional question resolved by our court today.

¶ 49 Shaud fared no better when he eventually got around to mentioning the "constitution." The legislative findings he cited simply acknowledged that the Adoption Act was designed to protect "the rights and interests of all parties affected by an adoption proceeding," including the "inchoate interest" of an unmarried biological father that may "acquire[ ] constitutional protection" if he complies with the statute. In context, this was no sort of suggestion that the statute might run afoul of the constitution and should be struck down on that basis. To the contrary, it was an express assertion that the statute itself protected a father's (inchoate) constitutional rights. Thus, these assertions actually undermine the majority's conclusion that Shaud preserved a constitutional challenge to the Adoption Act. *Supra* ¶ 39.

¶ 50 The same may be said of Shaud's assertion that "gross negligence cannot undermine the constitutional protections that the adoption code affords for doing everything within his power to comply with the adoption code." *Supra* ¶ 35. Again, this statement uses the term "constitutional," but it in no way amounts to a constitutional challenge to the statute. In fact, instead of challenging the Adoption Act, it again affirms that Shaud's position was that "the adoption code" protected his constitutional rights. Shaud was not asking the district court to strike down the statute. He was restating his view that his rights should be protected under the statute.[1]

¶ 51 The deficiency in Shaud's arguments, moreover, was not merely in his failure to use the right "magic words" or to "label[ ]" his argument as one rooted in "due process." *Supra* ¶¶ 37–38. It was that he never asserted a claim or argument that came close to asking the district court to strike down the Adoption Act's filing provision on constitutional grounds. As noted above, Shaud's pleading confirmed that he was simply asking the lower court to deem his notice of paternity statutorily sufficient. He was merely seeking, in other words, to protect his rights *under the statute* in light of his vague concerns about fairness and broad epithets about the State's carelessness. In so doing, Shaud at most raised an objection to the result reached in the district court on alternative—non-constitutional—grounds.[2] That is clearly insufficient under our case law.

## II

¶ 52 Even if Shaud had preserved a constitutional challenge to the Adoption Act, this

---

1. Shaud also fell short in the motion to reconsider, which even the court dismisses as insufficient. That motion did not preserve Shaud's constitutional claim—not only because it was raised in a disfavored motion that the district court appropriately declined to rule on, *see supra* ¶ 35 n. 14, but also because even there Shaud never came close to asking the district court to find the Adoption Act's filing provision unconstitutional. Instead, the motion to reconsider was just a reiteration of Shaud's contention that he had done "everything [he] physically and legally [could] do" and that his rights as a biological father were "protected by the due process clause of the Utah Constitution," *Supra* ¶ 35. In context, this again was not a request to strike down the Utah Adoption Act on constitutional grounds. It was simply an assertion that biological fathers

have constitutional rights, which are protected by statute. This did not give the district court a meaningful opportunity to rule on the constitutionality of the Adoption Act's filing provision, and it is thus insufficient to preserve that issue for appeal.

2. The majority suggests that Shaud made the "same arguments" that he asks us to resolve today, but simply fell short of "us[ing] the phrase 'due process.'" *Supra* ¶ 38. I respectfully disagree. The deficiency in Shaud's arguments was not in his failure to use the right "magic words." It was that he never challenged—in any words or phrasing to this effect—the filing provision of the Adoption Act as unconstitutional.

still would not be an appropriate case to reach the constitutional question because Shaud's claim fails on the statutory ground that he failed to submit a copy of the underlying paternity pleading. Under the Adoption Act, a biological father is required to submit to the Office of Vital Records not only a notice of initiation of paternity proceedings, but also an accompanying copy of the pleading filed in court to establish paternity. UTAH CODE § 78B–15–401(2). And the biological father's submission is complete—triggering the "filing" obligation of the Office of Vital Records, *id.* § 78B–6–121(4)—*only* when the notice of initiation of paternity proceedings is "accompanied by a copy of the pleading which has been filed with the court to establish paternity," *id.* § 78B–15–401(2). In this case, Shaud failed to submit the accompanying copy of the underlying pleading, and he thus failed to do all that was required of him by statute to protect his inchoate rights as a father.

¶ 53 This is accordingly not a case in which it can be said that Shaud "had done all that he could do to strictly comply with the [Adoption] Act." *Supra* ¶ 31. Shaud failed to submit the papers required of him under the statute, and thus we need not—and should not—go out of our way to sustain a constitutional right that hypothetically would be implicated if he had done so.[3]

¶ 54 The majority dismisses this problem first on the ground that Shaud's "failure to provide a copy of the paternity petition was 'not the basis of the [district court's] ruling.'" *Supra* ¶ 28 n. 8. But that is beside the point, as this failure could (and should) stand as an alternative ground for affirmance.[4]

¶ 55 Alternatively, the majority notes that the statutory provision requiring an accompanying copy of the paternity pleading is directed at the Office of Vital Records, not at putative fathers, and that Vital Records actually *"did* register Mr. Shaud's notice." *Supra* ¶ 28 n. 8. That is only partially accurate,

and also irrelevant. The putative father's filing duties under the statute are modified and clarified by the provision that indicates when his submission may be accepted into the registry of the Office of Vital Records. And because the registry statute unequivocally provides that "[a] notice of . . . paternity proceedings *may not be accepted into the registry* unless accompanied by a copy of the pleading which has been filed with the court to establish paternity," UTAH CODE § 78B–15–401(2) (emphasis added), a father who wishes to have his filing accepted by Vital Records surely *is* required to submit a copy of the pleading. In light of this requirement, the fact that in this case the Office of Vital Records ultimately accepted Shaud's filing does not indicate that "Shaud complied" with the Adoption Act, as the majority concludes. *Supra* ¶ 28 n. 8. The Office of Vital Records may have disregarded the clear, unequivocal command of the Adoption Act, but we have no license to do so, and Shaud's filing failure under the statute is another ground for declining to reach the constitutional question resolved by the court today.

¶ 56 Thus, I appreciate the due process concerns highlighted in Part I of the majority opinion, but I see no basis for addressing this constitutional question here. Preservation rules are an essential element of our adversary system, and we should not dilute them by stretching their standards to justify our consideration of a question we find interesting or important. The perils of such a move are underscored, moreover, in a case like this one where the constitutional question is not just unpreserved, but not even squarely implicated. We should not go out of our way to decide constitutional questions that are not squarely presented, as this one is not, given that the putative father failed to submit the documents required by statute.

¶ 57 In due time, we will be presented with a case in which the biological father has fulfilled the requirements of the Adoption

---

3. *West v. Thomson Newspapers,* 872 P.2d 999, 1004 (Utah 1994) ("[C]ourts should decide cases on nonconstitutional grounds where possible, including common law or statutory grounds.").

4. *Angel Investors, LLC v. Garrity,* 2009 UT 40, ¶ 38, 216 P.3d 944 ("We may affirm a judgment

on an unpreserved alternate ground where the alternate ground is apparent on the record and when the facts as found by the trial court are sufficient to sustain the decision of the trial court on the alternate ground." (internal quotation marks omitted)).

Act (to the extent he is able) and preserved a constitutional challenge to its filing provision. We should wait for such a case to resolve the question of the constitutionality of the Adoption Act. I respectfully dissent from a decision that I view as jumping the gun on this issue.